IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| JACQUELINE GILL,<br><br>         Plaintiff,<br><br>*versus*<br><br>ERIC W. DEVLIN, both personally and in his official capacity as English Department Chair, Tarrant County College, NE Campus;<br><br>*and*<br><br>ANTONIO R. HOWELL, both personally and in his official capacity as Division Dean of Humanities, Tarrant County College, NE Campus,<br><br>         Defendants. | CASE NO. 4:11-cv-623<br><br>(JURY TRIAL DEMANDED) |

### PLAINTIFF JACQUELINE GILL'S ORIGINAL COMPLAINT

This action seeks injunctive and monetary relief against officials of Tarrant County College, a public employer, for interfering with the continued employment of Plaintiff Jacqueline Gill as a professor in violation of her constitutional rights.

### I. JURISDICTION AND VENUE

1. Plaintiff brings this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Jurisdiction to grant the declaratory relief requested is provided under 28 U.S.C. § 2201.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the defendants reside and have their offices within the district and a substantial portion of the events giving rise to Plaintiff's claim occurred in this district.

**Plaintiff's Original Complaint**       1

## II.    THE PARTIES

4. Plaintiff JACQUELINE GILL ("Plaintiff" or "Gill") is a citizen and resident of Tarrant County, Texas.

5. Defendant ERIC W. DEVLIN ("Devlin") is sued both personally and in his official capacity as English Department Chair, Tarrant County College, Northeast Campus. Upon information and belief, Devlin is a citizen and resident of Tarrant County, Texas, and maintains an office at Tarrant County College, Northeast Campus, in Hurst, Texas.

6. Defendant ANTONIO R. HOWELL ("Howell") is sued both personally and in his official capacity as Division Dean of Humanities, Tarrant County College, Northeast Campus. Upon information and belief, Howell is a citizen and resident of Tarrant County, Texas, and maintains an office at Tarrant County College, Northeast Campus, in Hurst, Texas.

## III.    FACTUAL BACKGROUND

7. Tarrant County College District (the "District") is a comprehensive two-year institution established in 1965 pursuant to the Texas Education Code. The college has five major campuses in the cities of Hurst (Northeast Campus), Fort Worth (Northwest, South and Trinity River campuses), and Arlington (Southeast Campus). The District is a local independent district and is treated as a political corporation, distinct from the State itself, of the same general character as municipal corporations.

8. In 2009, Gill had approximately ten years teaching experience at the high school level, most recently as English Instructor and Department Chair at Fort Worth Independent School District, when she learned that the District was hiring new English professors at its Northeast Campus.

9. Gill applied for a position with the District and was granted a first-round

interview with a hiring committee of five members, including Devlin. During the interview, she conducted a teaching demonstration in which she provided handouts, gave a short lecture that incorporated technology, and led a discussion. The interview went well. One committee member told Gill how impressed she was, a second member commented to Devlin that Gill had done a better job than the other applicants they had seen, and a third member told Gill he thought all students could benefit from the way she taught.

10. Gill was granted a second interview with Howell and Northeast Campus Vice President Jane Harper ("Harper"). During the second interview, Howell stated that the positions they were filling were temporary, but explained that it was customary to hire full-time instructors on a temporary basis first. Howell explained that as long as the positions were converted to permanent ones, those same instructors would apply for them. When Gill expressed concern about leaving her current Ft. Worth I.S.D. permanent position for a temporary one, Harper reassured her by explaining that it was highly unlikely Gill would find herself without a job. After further discussion with both Howell and Harper, Gill understood that teachers who successfully complete a contract term and then apply for a permanent position as instructor are uniformly hired.

11. Gill successfully completed one final interview with Northeast Campus President Larry Darlage.

12. On August 21, 2009, Gill was hired as a full-time, temporary professor at Tarrant County College, Northeast Campus.

13. During her first semester, Gill regularly received high praise from her colleagues and superiors. Although Devlin did not personally observe Gill's teaching, he acknowledged

**Plaintiff's Original Complaint**                               3

that, "We are very happy to have you with us.  Everyone who has been working with you speaks most highly of you."

14.     In October of 2009, Gill was one of only two of the new hires who volunteered to participate in a 200-hour distance learning training to develop and teach an online course – a training that was unpaid and taken on her own time.  She completed the course a few weeks later.

15.     Gill also attended both diversity training and customer-care training, neither of which any of the other new hires attended.

16.     On October 28, 2009, Gill administered an exam in her composition course and a student stole the exam and tried to pass it to other students.  Several students reported the student who stole the exam to Gill, who in turn reported the incident to Devlin's office.  The same student who compromised the exam also skipped Gill's class during presentations.  Gill reported this to Devlin's office as well.  Gill later met with the student's counselor and learned that the student had a history of disruptive behavior and attacks on teachers.  The student ultimately withdrew from class and Gill was informed that the situation was closed.

17.     On November 9, 2009, Devlin met with Gill and informed her that the student identified in the preceding paragraph had made a complaint against Gill, claiming that Gill had flirted with girls during class.  Gill assured Devlin that such was not the case and noted that she was rarely the only instructor in the classroom.  No other students reported such accusations about Gill or corroborated the problem student's accusations.  Devlin responded with a lengthy diatribe about "homosexuals" and how the Texas public views them.  During the story, Devlin stated that Texas was a conservative state and that Tarrant County College was a conservative institution.  He concluded that, because of this, "Texas and Tarrant County College do not like homosexuals."

18. On November 18, 2009, Devlin finally observed Gill teaching one of her classes. He took notes and, at the conclusion of class, told Gill he enjoyed it very much and that she did a good job. He said they would have a formal meeting after the Thanksgiving break to discuss everything. That meeting never occurred.

19. In January 2010, Devlin told the temporary full-time instructors that he and Howell were personally trying to get all of their positions converted to permanent full-time positions within the department. Gill was concerned that continued employment suddenly sounded less assured, but left understanding that, if all the positions were converted to permanent ones, all of those in temporary full-time instructor positions would become permanent instructors

20. During the spring 2010 term, the need for more instructors was so great that Gill agreed to take on an overload course above her full-time load.

21. On January 27, 2010, Devlin sent out an e-mail indicating that he had missed observing most people during the first semester and needed to try to set up observation dates. Upon inquiring of the other new hires, Gill learned that she had been the only one whom Devlin had observed.

22. Throughout the spring semester, Gill continued to get positive feedback from colleagues, students and parents, yet Devlin still avoided meeting with her to provide feedback from his observation of her class.

23. On April 5, 2010, Devlin observed Gill's class a second time, but left telling Gill only that it went fine and they would discuss it later.

24. On April 19, 2010, Devlin observed Gill's class a third time. Again, he left saying only that she did a good job and that he had enjoyed the class, but that they would discuss it more specifically later. Gill learned from a colleague that a third observation was highly

unusual and something Devlin would normally do only if he was trying to gather information to get rid of someone.

25. On May 12, 2010, Howell advised Gill that the seven temporary full-time English instructor positions were ending and that Gill and the new hires she started with were all being re-designated adjunct faculty until the positions reopened as permanent full-time positions. Howell further advised that, at that time, the new hires were encouraged to re-apply for their positions.

26. When the seven permanent positions posted, Gill applied for all seven. By June 25, 2010, all seven positions had been filled. Even though the other members of Gill's hire group who applied had been permitted to interview, Gill had not been permitted to interview for any of the positions – a fact Devlin's secretary confirmed to Gill.

27. All of the people in Gill's hire group who worked as contract teachers and who applied for their positions were hired—except for Gill, even though her experience, credentials, and job-performance feedback met or exceeded that of those who were hired.

28. Devlin is the gatekeeper who forwards applications to the hiring committee. All applications must first be approved by him before they are submitted to the committee, which then determines who will be interviewed.

29. Gill's colleagues uniformly expressed confusion and shock when they learned she had not been allowed to interview for her position.

30. On August 19, 2010, Gill met with Howell. Howell indicated he never heard anything negative about Gill's work and that he wished Gill had been allowed to interview. Howell stated that he did not know why Gill had not been allowed to interview. Gill told Howell about the conversation in which Devlin relayed the College's dislike for homosexuals. Howell

**Plaintiff's Original Complaint**  6

said that we would immediately discuss the situation with Devlin and went to Devlin's office to do so. Howell did not communicate with Gill thereafter.

31.     Gill sent e-mails to both Vice President Harper and President Darlage requesting a meeting with either or both of them to discuss her concerns. Gill's attempts to escalate the matter fell on deaf ears: neither Harper nor Darlarge—nor anyone from their respective offices—ever responded.

32.     After Howell spoke with Devlin as he promised Gill he would, Devlin's attitude became more hostile toward Gill at work. During the fall 2010 semester, the College was so short staffed that adjunct faculty were given full-time loads, although they did not receive full-time pay or benefits.

33.     Despite a continuing shortage of instructors, Gill was not assigned any classes for the spring 2010 term, although she never has been formally dismissed from her position as adjunct faculty.

34.     As a result of Devlin's and Howell's conduct, Gill has been unemployed since the end of the spring 2010 term. In additional to her numerous unsuccessful attempts to find employment elsewhere, Gill also applied for 32 different positions at the District's various campuses. Despite her first-rate qualifications, the District has refused to offer her any position.

35.     Gill has suffered severe financial hardship because of Devlin's and Howell's conduct.

### IV.    CONSTITUTIONAL FACTS RELATING TO WHY SEXUAL ORIENTATION SHOULD BE GIVEN HIGHTENED JUDICIAL SCRUTINY

36.     Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth here.

**Plaintiff's Original Complaint**                              7

37. Based on the traditional considerations that determine the appropriate level of scrutiny for equal protection claims, classifications based upon sexual orientation warrant heightened scrutiny by the courts.

38. Lesbian and gay individuals have suffered a long and significant history of purposeful discrimination in a wide variety of settings. Federal, state, and local governments have all played a significant role in this history, including for years deeming lesbians and gay men unfit for employment in public employment and barring them from governmental jobs based on their sexual orientation. The federal government and many states and localities began aggressive campaigns to purge lesbian and gay employees from government service since at least the 1940s.

39. Sexual orientation is immutable in the sense that it is fundamental to one's identity, fixed at an early age, and highly resistant to change. Efforts to change an individual's sexual orientation are generally futile and potentially dangerous to an individual's well-being. Lesbian and gay individuals should not be required to abandon their sexual identity to access fundamental rights nor to hide their identities to avoid discrimination.

40. Lesbians and gay men historically have lacked political power. Although they have achieved some advances against discrimination, these gains have consistently been met with strong political and public backlash, and lesbians and gay men continue in many parts of the country to be denied any remedy for the widespread discrimination they face in private employment, housing, and public accommodations and to be subject to express discrimination by the government regarding their relationships and parenting rights. Still today, lesbians and gay men lack the consistent ability to attract the favorable attention of lawmakers.

41. Homosexuality, in and of itself, implies no impairment to judgment, stability, reliability, or general social or vocational capabilities. A person's sexual orientation bears no inherent relation to a person's ability or capacity to contribute to society. Whether premised on pernicious stereotypes or simple moral disapproval, laws classifying based on sexual orientation rest on factors that generally provide no sensible or legitimate ground for differential treatment.

## V. FIRST CLAIM FOR RELIEF
**Declaratory and Injunctive Relief Against Defendants Personally and in Their Official Capacities for Violation of Equal Protection**

42. Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth here.

43. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall deny any person the equal protection of the laws.

44. Public employees do not lose their constitutional rights when they accept public employment positions. While those rights may be balanced against the requirements the government has in its role as an employer (as opposed to a sovereign), the Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently. Public employers cannot take personnel actions that would violate the Constitution.

45. Devlin and Howell ("Defendants"), each acting in his official capacity and under the color of state law, have adopted or furthered a practice of rejecting otherwise qualified applicants for employment based on a belief that lesbian and gay persons should not be allowed to teach at Tarrant County College because of their sexual orientation. Defendants are depriving

and will continue to deprive Gill of rights secured by the Fourteenth Amendment to the U.S. Constitution in violation of 42 U.S.C. § 1983.

46. Gill is similarly situated in all relevant respects to other applicants for full-time, permanent faculty positions at Tarrant County College. Her experience, background, and qualifications matched or exceeded those of other applicants who were permitted to interview for and obtained teaching positions at the time that Gill applied. Defendants refused to interview Gill—despite her impressive credentials and job performance—because of their perception that she is gay.

47. A public employer's actions that treat a class of employees disparately based solely on the employees' sexual orientation are inherently suspect and must be analyzed under strict or at least intermediate scrutiny. Such employer conduct will be presumed to violate equal protection unless the government can demonstrate that the classification is necessary to meet a compelling government interest or, at a minimum, is substantially related to an important government objective. The classification used by the employer, as well as the resulting discriminatory conduct, can be defended only by its actual governmental purpose, not a different rationalization invented after the fact.

48. Defendants' refusal to permit Gill to interview for a permanent teaching position, and their interference with the hiring process regarding Gill's application, based on their perception that she is lesbian, violates the Constitution's equal protection guarantee under any heightened scrutiny standard because their conduct neither advances substantially any important governmental interest nor is necessary to further a compelling governmental interest in an adequately tailored fashion.

49. Even without application of heightened scrutiny analysis, Defendants' conduct still fails the Constitution's equal protection guarantee under the most deferential level of scrutiny because it bears no rational relationship to any legitimate governmental interest.

50. In the absence of an independent legitimate governmental interest, a classification that treats lesbian and gay employees differently and worse than other employees because of their sexual orientation solely for the purpose of expressing moral disapproval constitutes a classification for its own sake motivated by animus and, therefore, is constitutionally impermissible.

51. Accordingly, Defendants' conduct should be declared to violate the Equal Protection Clause of the U.S. Constitution and Defendants' continued interference with the hiring process as it pertains to Gill, or any other gay or lesbian applicants, should be enjoined.

## VI.   SECOND CLAIM FOR RELIEF
### Compensatory and Exemplary Damages Against Defendants in Their Personal Capacities for Violation of Equal Protection

52. Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth here.

53. The rule that lesbian and gay people, as a class, are constitutionally protected from discrimination that, at a minimum, fails to rationally furthers a legitimate government interest has been clearly established by the Supreme Court.  A classification that serves no purpose other than to disadvantage and express disapproval of lesbian and gay people because of their sexual orientation cannot withstand any level of constitutional scrutiny.

54. The Supreme Court has been equally clear that the Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently.  Public employers cannot take

personnel actions that would violate the Constitution.

55. Because of Defendants' unconstitutional conduct, Gill was deprived of wages and benefits she would have received had she been allowed to complete the hiring process and has suffered damages as a result. Thus, Gill is entitled to recover compensatory damages from the Defendants in their personal capacities.

56. Defendants acted with a malicious or evil intent or with a callous disregard for Gill's federally protected rights. Thus, Defendants are liable in their personal capacities to Gill for exemplary damages.

## VII.   JURY TRIAL DEMAND

57. Plaintiff demands a jury trial on all issues that may be tried to a jury.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment:

- A) declaring that Defendants' conduct violates Plaintiff's equal protection rights under the U.S. Constitution;

- B) enjoining Defendants from denying Gill the opportunity to complete the interview and hiring process to become a full-time permanent instructor or otherwise unlawfully interfering with that process;

- C) awarding back pay for the time Gill reasonably would have been employed as a full-time permanent instructor had she been permitted to complete the hiring process, as well as other compensatory damages, including incidental and consequential damages, proven at trial;

- D) awarding punitive damages against the Defendants for their intentional violation of Plaintiff's constitutional rights;

- E) awarding statutory costs pursuant to 28 U.S.C. § 1920;

- F) granting reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

- G) granting such other and further relief to which Plaintiff is entitled.

Respectfully submitted this 7th day of September, 2011.

        LAMBDA LEGAL DEFENSE &
        EDUCATION FUND, INC.

        By:  _s/ Kenneth D. Upton, Jr._____
            Kenneth D. Upton, Jr.
            State Bar No. 00797972
            kupton@lambdalegal.org

        3500 Oak Lawn Avenue, Suite 500
        Dallas, Texas 75219-6722
        Telephone:  (214) 219-8585
        Facsimile:   (214) 219-4455

        *and*

        GIBSON, DUNN & CRUTCHER, LLP

        By:  _s/ Benjamin D. Williams_____
            Benjamin D. Williams
            State Bar No. 24072517
            bwilliams@gibsondunn.com

        2100 McKinney Avenue
        Dallas, TX 75201-6912
        Telephone:  (214) 698-3154
        Facsimile:   (214) 571-2904

        ATTORNEYS FOR PLAINTIFF
        JACQUELINE GILL

**CERTIFICATE OF SERVICE**

    This is the Original Complaint.  Waiver of service will be requested for each defendant in accordance with Fed. R. Civ. P. 4(d)(1)(A) or, in the absence of waiver, Summons will be served as further required by that rule.

        _____s/ Kenneth D. Upton, Jr._____
            Kenneth D. Upton, Jr.